UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

HUNTER R. LEVI )
  )
        Plaintiff, )
  )
  v. )
  )
AEROTEK, INC. & )
ALLEGIS GROUP )
  )
        Defendants, )
  )

CIVIL COMPLAINT

I. Parties

  A. Hunter R. Levi
     13001 W118 Terrace
     Overland Park, KS  66210

  B. Aerotek Inc.
     7301 Parkway Drive
     Hanover, MD  21076

  C. Allegis Group
     7301 Parkway Drive
     Hanover, MD  21076

II. Jurisdiction, **Venue** & Counsel

   Hunter R. Levi, a current resident of Kansas, and a former 40-yr+ resident of Missouri, was wrongfully terminated in violation of Missouri and federal law by Aerotek, Inc. and The Allegis Group. Both are based in Maryland, with offices across the U.S. and the world, including the St. Louis, MO office where Levi was employed by Aerotek from February 2005-October 2005.

   Aerotek and Allegis conspired to wrongfully terminate Levi and were joined by an outside party (UC Express), and numerous Aerotek and Allegis employees including Levi's direct supervisor, an Aerotek clerk, Aerotek's CEO, and an Allegis Group co-Chairman who is the founder of Aerotek and majority shareholder of Allegis Group. This conspiracy has as its goal, the termination of Levi, defamation of Levi and his work record, interference and obstruction with a Levi v Anheuser Busch Sarbanes Oxley action at the USDOL, and the coverup of these actions and Aerotek and Allegis' breach of contract with Levi. AB was Levi's previous employer, and AB has significant and substancial ties and business interests with the Aerotek founder and Allegis co-Chairman.

   Because Aerotek and Allegis' wrongful termination of Levi put them at serious risk because it violated Missouri employment law concerning child support, federal bankruptcy law concerning employment of bankrupt-

cy filers, and the Sarbanes-Oxley Act of 2002, Aerotek and Allegis falsely claimed through UC Express, that Levi quit Aerotek of his own volition; after Levi filed for Missouri unemployment benefits after his termination from Aerotek.

And after learning the true seriousness of the jeopardy their actions put them in civilly and criminally; because of Levi's involvement as a Sarbanes-Oxley securities fraud whistleblower against AB, Aerotek and Allegis presented misleading and perjurous sworn testimony in a Missouri unemployment benefits appeal hearing to cover up their prior illegal actions. Aerotek and Allegis took these illegal actions against Levi, the State of Missouri and the United States, to financially benefit Aerotek and Allegis' owners and employees; and escape prosecution for numerous illegal acts.

Levi brings these actions under Missouri Causes of Action: Torts Issue 0 (1993) Chapters 26&10; the Federal Bankruptcy Code; the Sarbanes-Oxley Act of 2002; and 452.350.9RSMO.

Levi resides within 20 miles of the Western District of Missouri Courthouse in Kansas City, MO; and is proceeding pro se and in forma pauperis in a separate civil action against AB at the same courthouse. Although Aerotek is a defendant in this action in a limited area, that action deals with Levi's 2003 AB termination, which Aerotek has pleaded to having no role in, or the conspiracy to commit such termination. Aerotek and Allegis' termination of Levi and its coverup in 2005 and 2006, which continues today, is actionable separately. Even if Aerotek took these actions without communications before or after the fact with AB, they still remain illegal under the named causes of actions.

Levi has already been granted IFP status by this Court in the Levi v AB action, and asks the Court to extend the status to this action as well, since Levi's financial status has not changed. And Levi seeks this venue because travelling across the State of Missouri for a possible jury trial would be an extreme hardship. Levi is pro se in this action as well.

III.   Statement of Claims

Sometime in October 2005, Aerotek illegally terminated Levi from his employment at Aerotek. The exact date is not known to Levi because Aerotek fraudulently maintains Levi quit Aerotek. This is the key material issue in dispute because Levi did not quit, and was terminated by Aerotek.

LEVI'S AEROTEK EMPLOYMENT

Because of AB's illegal termination of Levi in August 2003, Levi's decades long work record at AB from 1979-2003 was useless in securing gainful employment. Levi's efforts at job hunting were unsuccessful because of AB's false claim Levi was terminated for misconduct related to his job performance. Levi, who made $25@hour at AB was even unsuccessful in winning an $8@hour porter job from an auto dealership he purchased a Sterling, Jaguar and 3 Mercedes Benzes over the decade before, and had a social relationship with the dealer's Sales Manager.

2

Case 4:09-cv-00058-DW Document 4 Filed 02/12/09 Page 2 of 12
Case 4:09-cv-00058-DW Document 2 Filed 02/12/09 Page 2 of 12

Because of the futile work searches, Levi decided to try day labor in January 2004, because work records were irrelevant to day labor agencies. Levi started at Labor Ready in St. Charles, MO, and his very 1st assignment was Vascor, a Daimler Chrysler subcontractor who managed Chrysler USA's auto storage yards off site of the manufacturing plant. As Levi drew other Labor Ready assignments, while periodically going back to Vascor in the first couple of months in 2004, Vascor grew so happy with Levi's work that they asked Labor Ready in May 2004 to send Levi exclusively to them; and make Levi a Labor Ready Supervisor so Levi could be paid weekly instead of daily, and become eligible for overtime.

This raised Levi's pay from $7@hour to $8, and Levi worked whenever Vascor needed him, in lots scattered in Missouri and Illinois in a 40-mile radius of downtown St. Louis. This was of no help to Levi's financial situation. After using up his life savings in 2003 and early 2004 trying to save his home, Levi was forced to sell his home before foreclosure in July 2004; and was able to get a 15 month lease on an apartment, while continuing his U.S. government proceedings against AB. But Levi's low-paying Labor Ready job and significant debts were unmatched, and in May 2005, Levi was forced to file Chapter 7 bankruptcy.

In February 2005, because Vascor was unhappy with the temp labor Labor Ready was sending them, the temp contract was moved to Aerotek, a much more prestigious temp agency. Aerotek provided Vascor with 15-20 new temp workers, as well as hiring 5 Labor Ready temps to work for Vascor, including Levi. Aerotek did not inquire about Levi's past employment when hiring Levi because of Vascor vouching for Levi's job performance made it unneccesary. Levi received a raise to $8.75@hour and overtime from Aerotek.

In the subsequent months, all the new Aerotek workers were let go by Vascor because of poor performance; and all the Vascor vouched for Aerotek hires were let go for poor performance as well; except for Levi. Levi was given a raise by Aerotek to $9.15@hour in late summer 2005.

In the meantime, Levi's bankruptcy was proceeding, and Levi's SOX proceedings against AB had been transfered to the USDOL's Kansas City offices after mishandling in the USDOL's St. Louis and D.C. offices in 2003 and 2004.

It became clear that Levi's bankruptcy and his SOX case could prompt a move by Levi to the KC area. Levi approached his Aerotek supervisor Tim Jones in June 2005, and asked if Aerotek had work in KC. Jones replied, "just send me a resume a couple of weeks before you leave and I'll set you up in KC". Aerotek has multiple offices in the KC area. Vascor is a subcontractor for Toyota and GM in the KC area.

As Levi was completing Chapter 7 bankruptcy in the summer of 2005, his apartment complex refused to renew his lease because of the bankruptcy filing, and Levi would be forced to move when the lease was up in September 2005. Because Levi made frequent trips to KC to visit his friends; and one offered to let Levi move in; Levi decided to relocate to KC, especially in light of now being closer to the USDOL office handling Levi's SOX complaints against AB.

Levi informed his Aerotek supervisor Tim Jones of the pending move in late September 2005; and Jones reiterated his request for Levi's re-

sume, to set up work for Levi in KC. In the first week of October 2005, Levi sent his resume to Jones, and Levi's last day working in St. Louis was Friday 10/14/05. Levi moved to KC on 10/16/05. Levi was confident that with work from Aerotek, significant help from friends in KC, and significant developements in the Levi v AB proceedings; Levi would finally prevail in restoring his stellar AB work record, and receive substantial restitution from AB for their illegal actions against him.

## AEROTEK'S REVERSAL

In the week after moving to KC, Levi called Aerotek's Jones in St. Louis to inquire about Levi's previous weeks paycheck being mailed to the proper KC address. During this discussion, Jones inquired of Levi whether Aerotek KC had contacted Levi yet about work in KC. Levi informed Jones that no one had called. Jones then told Levi, "don't worry about it, I'll take care of it". Levi never heard back from Jones or Aerotek KC.

Levi did however receive notice the same week from the State of Missouri, that on 10/7/05, Missouri sent a wage garnishment notice to Levi's St. Louis Aerotek office; concerning 2003 back child support. This notice was generated by Levi's Chapter 7 bankruptcy being finalized in mid-September 2005; and the $1600 was part of the restitution Levi was seeking from AB in his SOX complaints.

Because Jones never called Levi back with information about Aerotek KC work, or who Levi should contact in KC, Levi feared that Aerotek had contacted AB because of the prominence in Levi's resume, or that the child support garnishment and bankruptcy had spooked Aerotek into contacting AB. Levi feared AB would fraudulently smear his work record and Aerotek had decided to terminate Levi.

## LEVI'S UNEMPLOYMENT FILING

In order to protect his rights, Levi subsequently filed for Missouri unemployment benefits. Levi knew Aerotek would have to file an answer.

Levi was employed at will by Aerotek, and subject to termination by Aerotek for any reason or no reason. Levi even signed an Allegis employment contract in early 2005 attesting to such. Aerotek could legally terminate Levi at any time, unless of course they violated Missouri child support laws, federal bankruptcy laws, and the Sarbanes Oxley Act of 2002 to do it. To Levi's surprise, Aerotek did not claim they terminated Levi. Instead Aerotek claimed Levi quit, and challenged Levi's claim for unemployment. Levi's unemployment was denied, and Levi was forced to appeal because Aerotek lied about Levi quitting.

## 2006 UNEMPLOYMENT APPEALS

In a January 2006 Missouri unemployment appeals hearing, Levi appeared in person, and reiterated his claim that Aerotek terminated him. Aerotek appeared by phone. Levi had previously presented substantial pre-hearing pleadings to the tribunal and Aerotek. Aerotek offered only their claim Levi quit, through an outside subcontractor, UC Express. Instead of providing Levi's Aerotek supervisor on the phone, Aerotek

provided a low level clerk from a different office from Levi and Jones, who had no firsthand knowledge of the events at issue, and no supervisory authority. Because an employer can only be represented by a person with supervisory authority under Missouri unemployment procedures, Aerotek actually did not appear by law, and the **appeals tribunal** should have denied the clerk's appearance and found for Levi.

Levi protested on the record the appearance of Aerotek's clerk, and the Missouri appeals referee went out of her way to put on the record that the clerk's appearance for Aerotek was problematic.

Since this Aerotek clerk Becky Stevener had no firsthand knowledge of any Levi-Aerotek dealings, she opined instead of testifying, provided no evidence on Aerotek policies, and sheepishly claimed Levi's relocation to KC was proof Levi quit, Levi sending his resume to Aerotek was actually an indication of Levi giving 2 weeks notice of quitting, and that Aerotek would only contact AB if Levi gave permission.

Levi countered that informing an employer of quitting by sending a resume made no sense, and that Levi's providing a resume would indicate Levi's comfort with Aerotek contacting AB. When pressed by the referee, Aerotek's Stevener could not answer whether or not Aerotek contacted AB or produce a policy that prohibited Aerotek from contacting a previous employer.

Astonishly, Levi lost the appeal. What happened in the weeks between the hearing and the decision is anybody's guess.

Then Levi followed Missouri unemplyment benefits procedures and appealed the decsion to the Missouri Labor & Industrial Rights Commission, and lost. Levi, then followed procedure by appealing the Commission decision to the Missouri Court of Appeals, lost, and was denied access to the Missouri Supreme Court. The 3 judge panel refused to print their decsiøns on both issues, even after Levi protested.

It's also important to note that in the Commission and Court proceedings, Aerotek was represented by the Missouri Employment Security Chief Counsel, not personal internal or outside counsel. And neither the Commission nor the Court granted Levi's requests that Levi's supervisor be ordered to appear at anytime in the proceedings. In short, Aerotek has never answered the material issue in dispute, with anyone with firsthand information, or the supervisory authority to give such. In addition, Aerotek's CEO Tom Thorton and Allegis Group co-Chairman and Aerotek Founder Stephen Bisciotti have refused to provide Aerotek or Allegis answers to Levi USDOL SOX interrogatories about the Aerotek termination of Levi, since Levi sent them during litigation of his SOX complaints at the USDOL in late 2006.

OUTSIDE EVENTS

It is also important to note what happened to the Missouri Employment Security Chief Counsel who represented Aerotek against Levi; and 2 of the 3 appeals judges who denied Levi's appeals and requests.

5

Because Levi had been informing Governor of Missouri of Anheuser Busch securities fraud and influence peddling since 2003, and the MO Attorney General since early 2005, Levi wrote both in mid-2006 requesting an investigation into Missouri's handling of Levi's unemployment appeals. Governor Blunt's office assured Levi that nothing was amiss, and the AG's office replied their office had no jurisdiction. Levi later wrote the Chief Justice of the Missouri Supreme Court seeking an investigation of the appeals judges decisions.

In late 2006 and early 2007, 2 of the 3 judges who heard Levi's appeals left the bench to return to private practice or teach. The one who left to teach at Liberty University was then under investigation by the Kansas AG for suspect financial dealings as a trustee of an Overland Park Kansas Christian Ministry. After writing the Kansas AG for an update on the judge in 2007, and being told that Missouri proceedings were outside the jurisdiction of Kansas, Levi has not heard anything more of the investigation of the former Missouri judge, and the Kansas AG conducting the investigation was forced to resign in January 2008 over a sex scandal.

As for the Missouri Employment Division Chief Counsel representing Missouri and Aerotek against Levi in 2006, Governor Blunt publicly fired her for misconduct in early 2007, and later astonished Missouri and the nation by not seeking a 2nd term as Governor in 2008.

## AEROTEK & ALLEGIS INTENT

In understanding the intent and actions of Aerotek and Allegis employees conspiring to terminate Levi and cover it up, its important to look at the nature of temp agencies; Aerotek and Allegis' structure and their owners business and personal ties to AB; and the danger Levi presented to AB in October 2005 and the following months after he was illegally terminated by Aerotek.

1. Nature of temporary employment agencies.

Temporary employment agencies often look the other way unless there are significant red flags in a potential employee. Aerotek's 1st look at Levi was already after 7 months of his successful employment for Aerotek. Levi had already fulfilled the most important duty a temp agency requires; putting a body into a slot for at least double what it pays the employee, and hope that everything works out. The number one problem for temp agencies is getting a worker to show up.

Along with a majority of temp workers who are just down on their luck, are convicted felons, people with physical and mental problems, financial deadbeats, the drug and alcohol challenged, etc. Aerotek employees are trained to spot red flags, in employees and employers.

Levi working 24 years at AB, and then day labor after would be a red flag. Then just a few days after receiving Levi's all AB work record, Aerotek received Levi's Missouri child support garnishment notice, another red flag. The next likely Aerotek and Allegis policy step would be a background or credit check, and possibly a drug test. Finding Levi's bankruptcy would be another red flag.

Since requesting a Levi drug test would legally infer intent to employee Levi in another position, and terminating Levi for child support and Chapter 7 bankruptcy is illegal under Missouri and federal law, the logical place to get info on Levi in order to find a legal reason to fire him such as drug use, misconduct, crime, assault, etc. would be AB. Did Levi harm someone, get busted or steal from AB? Aerotek's Stevener even stated in the unemployment appeals hearing that bankruptcy and garnishments can disqualify workers from some sensitive job placements.

Because Aerotek had a legal problem with Levi, they used common temp labor practices to exit their employment agreement with Levi; they lied. Aerotek had promised Levi work in KC, and now wanted to retract it because of issues of child support garnishments, personal bankruptcy and misconduct at AB. **All three reasons are illegal under Missouri** child support law, federal chapter 7 bankruptcy law, and the Sarbanes-Oxley Act of 2002. Levi was following the law in all 3 instances and Levi was terminated because of it.

Aerotek's desire to get rid of Levi was accomplished by using common temp industry tactics. Delaying answers on work forces a potential employee to go elsewhere; and in the case of a current temp employee does the same, but with an additional problem. If the temp employee has worked long enough in his state to qualify for unemployment, temp agencies discourage collecting unemployment to keep costs low, and routinely deny unemployment. Levi was qualified for Missouri unemployment due to working for over a year at Labor Ready, followed by 7 months for Aerotek.

Since Levi filed for unemployment, and none of the reasons for Aerotek's termination of Levi were legal, Aerotek falsely claimed Levi quit to deny the unemployment and record a reason other than termination as an excuse to breach their contract with Levi. The unemployment benefits delay forces an ex-employee to look elsewhere for work, which if he finds, makes the employee ineligible for unemployment and significantly reduces the likelihood and exposure to litigation for the temp company.

The real beauty of this delaying strategy is saved for temp employees who fight for the unemployment benefits. First of all, the amounts are small. In Levi's case the most he could receive was $200 a week up to $4000. Getting an attorney on contingency would be impossible; and fired temp workers do not have $1500 to spend upfront on an attorney for a chance to get $200 a week in benefits, months down the road. The dirty little secret of this fraud by temp companies on workers and the State of Missouri is; in any employee appeal after losing the first round, the employer is represented by the State of Missouri. Fraudulently denying a temp employee unemployment is a business costs policy decision made by Aerotek and Allegis, and facilitated by the misuse of Missouri resources.

As despicable as it is, Aerotek was just following procedures developed by Aerotek and Allegis management, enacted to get rid of red-flagged employees such as Levi; and in order to keep costs low, deny them unemployment. Aerotek's hope was to circumvent the illegality of their decision to terminate Levi, and accomplish it by the fraudulent denial of Levi's unemployment.

7
Case 4:09-cv-00058-DW Document 4 Filed 02/12/09 Page 7 of 12

In most cases, this would be the end of the story, and the fired temp worker would just head to the next temp agency for work. But instead Levi appealed, and in pre-hearing pleadings informed Aerotek of the true nature of AB's massive securities fraud on shareholders and disgusting illegal retaliation against Levi for blowing the whistle on this then $30 billion fraud; which later resulted in Levi's bankruptcy and child support garnishments orders to Aerotek. Rather than remedying what they did to Levi, Aerotek continued to fight; and even presented misleading and perjurous testimony under oath and on the record to the State of Missouri. Aerotek and Allegis would not risk this much over $4000 in unemployment benefits; paid out of a fund they contributed to for years.

2. Aerotek and Allegis structure and ties to AB.

Aerotek was founded in the 80s by Stephen Bisciotti, and is now owned by the Allegis Group, where Bisciotti is co-Chairman and majority shareholder. Bisciotti's rise to wealth and membership in the Forbes 400 was built on Aerotek; and later led to his majority ownership of the NFL's Baltimore Ravens.

AB has had for years numerous contracts across the U.S. for seasonal and contract workers; along with a massive sports sponsorship and marketing program; including the NFL and the Baltimore Ravens themselves. AB provides significant income to Bisciotti through these entities.

Bisciotti seeking AB's favor would just be good business judgement. And like any other good business, Aerotek and Allegis promote themselves to potential employers, business partners, and their own employees. Allegis and Aerotek's ties to the NFL ownership of its Chairman and founder would be an immense source of pride for Aerotek and Allegis employees. Any Allegis or Aerotek employee would know of the significant revenues AB provides to the NFL and the Baltimore Ravens, beyond any AB/Aerotek/Allegis temp contracts.

If Aerotek or Allegis held no AB temp contracts, it would be routine for Bisciotti to use his NFL ownership as a tool to win AB contracts for Aerotek or Allegis. Any Aerotek or Allegis employee wanting to help or protect their company would see a threat to AB as a threat to their own company, or at the very least, a chance to curry favor with the head honcho; who built Aerotek from scratch.

Most companies reward employees who protect existing business or bring in new business. And with top AB executives and board members facing massive fines and prison if Levi prevailed in his SOX cases in late 2005 and early 2006, there is no doubt AB would welcome a little help from Aerotek and Allegis.

3. Levi v AB SOX proceedings climate in October 2005-early 2006.

Levi's SOX complaints against AB were transferred from the USDOL-KC to USDOL-KC in late December 2004. Levi's relocation to KC in October 2005 ensured that things would start rolling, which they did. But the real threat to AB was, Levi's fraud claims against AB had been

8

Case 4:09-cv-00058-DW Document 4 Filed 02/12/09 Page 8 of 12
Case 4:09-cv-00058-DW Document 12 Filed 02/12/2009 Page 8 of 12

validated by AB settling out of court the Roger Maris family v AB civil actions in late August 2005.

One of the key reasons AB illegally retaliated against Levi from 2001-2003 was Levi's internal and external whistleblowing about how AB's defense in the Maris trials was a fraud; and how that fraud would significantly damage the company. And because AB misleading shareholders in SEC filings about the true nature of the risk the Maris trials presented to AB was a securities fraud violation; it was also a violation of Sarbanes-Oxley. Losing the Maris trials by jury verdict would cost top AB execs and board members their jobs, send many to prison, and devastate AB's reputation and business.

After fighting the Maris family in court since 1997, and minutes after the jury informed the court a decision had been reached, AB settled with the Maris Family before the verdict could be read. The settlement itself cost AB $120-250 million; and it ravaged AB's 2005 3rd quarter profits. AB stock, which was at $55 in 2002 when AB first started suspending Levi for his whistleblowing, crashed to $40 in the weeks after the settlement, and stayed near $40 for months. This alone was $13 billion in shareholder losses. AB sales dropped and their 2005 4th quarter profits plummeted 39% from the year before.

Everything Levi **wrote** about AB fraud since 2002, to government agencies, members of Congress, business leaders, media agencies and Missouri politicians, was finally proven to be true. It was imperative to AB that they make Levi go away by October 2005. And when Aerotek contacted AB to check on Levi's work record, they would have started at AB HR-St. Louis; whose manager led the internal illegal retaliation against Levi from 2001-2003, under the direction of AB CEO and Chairman August Busch III. Busch III fraudulently confiscated the Maris family distributorship in 1997, after the Maris family refused to sell it to AB; so that Busch III could give it to his daughter as a gift, upon her leaving AB employment and relocating to Florida.

IV. Related Cases & Continuation of Aerotek/Allegis conspiracy To Coverup Their Termination of Levi

As previously noted, Aerotek is also a defendant in a separate Levi action against AB, for conspiracy in covering up AB's illegal termination of Levi in 2003. The case number is 08-0398-CV-W-RED. Allegis is not a defendant in that Levi action. Aerotek actions in this other Levi action are however a continuation of their conspiracy to coverup Aerotek's own illegal actions against Levi in 2005&2006.

While Aerotek's suspect actions were many, the one of main concern to this Court and this Levi v Aerotek/Allegis action was a fraudulent attempt to mislead the Court in Aerotek's Levi v AB dismissal pleadings; by falsely claiming to a federal court that the issue of Levi's Aerotek employment was legally settled by Missouri law.

Aerotek falsely claimed to this very Court, that since Missouri found for Aerotek in administrative unemployment proceedings in 2006, the matter was settled under the law. Aerotek misled the Court in Levi v AB proceedings in a desparate attempt to preempt future Levi action against Aerotek and Allegis; which would also put Aerotek and Allegis

9

Case 4:09-cv-00058-DW Document 4 Filed 02/12/09 Page 9 of 12
Case 4:09-cv-00058-DW Document 4 Filed 02/12/09 Page 9 of 12

at risk in any AB shareholder, banker, employee or U.S government litigation against AB; because Aerotek aided AB's fraud by their actions against Levi, a SOX whistleblower.

And Aerotek was aided on this fraud on the Court by their counsel and AB. Aerotek's counsel, Blackwell Sanders was attempting to use their prior employment relationship goodwill with the presiding federal judge in the case, to obtain a ruling which would preempt future Levi action against Aerotek and Allegis. And AB aided Aerotek and Blackwell Sanders by conceding lead arguments to Aerotek counsel. Aerotek and AB were both clearly aware of the misleading because not only did Levi point it out to the Court, but Missouri law specifically forbids the use of unemployment benefits determinations in any subsequent legal actions, such as Levi v Aerotek/Allegis or Levi v AB et al.

Aerotek knowingly misleading a **federal judge about Missouri law** is further evidenced by events surrounding Levi's 2003 AB termination. In 2003, Levi applied for unemployment, and was denied benefits by AB for misconduct related to Levi's work. Levi appealed to the same appeals tribunal as he did later with Aerotek in 2005. Levi prevailed at the tribunal, which ruled **in** 2003 that AB's claim of Levi misconduct was not believable. AB did not appeal.

Clearly, if a Missouri unemployment appeals determination settled things as a matter of law, Levi actions against AB would have been settled in 2003, and Levi would have never even worked at Aerotek because the USDOL would have reinstated Levi to AB with backpay and damages, under the Sarbanes-Oxley Act of 2002. AB used the exact same Missouri law precluding the use of Missouri unemployment determinations in later actions in pleadings in the Levi v AB SOX cases at the USDOL.

Beyond the fact that Aerotek was hoping to take advantage of the presiding judge's goodwill to Aerotek counsel, Aerotek took this risk because while Missouri law forbids the use of the unemployment determination in future proceedings, it does allow for the use of any documents, pleadings or sworn testimony from the proceedings.

Aerotek misled this federal Court in the hopes of neutralizing the misleading and perjurous testimony and arguments they presented to Missouri in the 2005&2006 unemployment proceedings against Levi. Aerotek's actions in their denial of Levi's unemployment are proof of Aerotek's guilt in their actions against Levi in 2005. Aerotek was hoping to fraudulently bury their illegal actions underneath the Levi v AB et al action; and thought nothing of using a federal judge or this Court to do it.

V. Relief

Levi seeks an immediate judgement, against Aerotek and Allegis for the wrongful termination of Levi, defamation of Levi and his work record, breach of contract, and interference and obstruction of Levi litigating his SOX and civil cases against AB. Aerotek and Allegis' years long interference with Levi pursuing his AB claims included withholding information from Levi, the USDOL and the Court; and actions meant to deny Levi the financial resources to pursue his litigation against AB, and later Aerotek and Allegis.

10

Case 4:09-cv-00053-DW Document 4 Filed 02/12/09 Page 10 of 12
Case 4:09-cv-00053-DW Document 2 Filed 01/21/2009 Page 10 of 12

VI.  Damages

Levi seeks $2.5 million in actual damages, $5-136 million in punitive damages; and under special damages require Aerotek and Allegis to post a bond of $5 billion to be made available to anyone damaged by Aerotek's and Allegis' complicity in AB $40-60 billion securities fraud.

VII.  Extraordinary Circumstances And Manifest Injustice

Numerous federal and state statutes, including the Sarbanes-Oxley Act of 2002, allow for the consideration of extraordinary circumstances and manifest injustice against parties. Levi is also in SOX proceedings against AB in the DC Court of Appeals and civilly against AB in this Court. Aerotek and Allegis is withholding information critical to both.

In Levi v AB, Levi is seeking Court and SEC action to freeze part and hopefully all of the $52 billion AB/InBev payout. If the Court finds Aerotek terminated Levi and covered it up, to aid AB, not only will Levi's SOX and civil cases against AB be won; but the entire AB-InBev deal will be exposed as part of AB's decade long securities fraud. Thousands of Americans and state and federal government agencies will be seeking restitution from AB and those who aided them; such as Aerotek and Allegis.

In December 2008, InBev started massive layoffs at AB in the U.S., and the majority are Missourians. Because the AB/InBev deal is part of a fraud, these workers will eventually seek class action status for damages against AB/InBev.

On December 30, 2008, under holiday cover, AB/InBev quietly announced cross subsidiary-parent loan guarantees which are a desperate attempt to retain the promised global financing for the deal. The global banks are pressuring AB/InBev to pay up because they know the AB/InBev deal is a fraud and will likely implode. They know this because Levi has kept them up to speed on the fraud in 2008, and because they are contractually bound to the deal, and want their money back as fast as possible. AB/InBev is having trouble in complying.

The result would be an implosion of the deal and resultant legal and financial chaos. Bankers, shareholders, employees, advisors and the U.S. and global governments will be seeking restitution from a by then bankrupt entity. The Court has a chance to minimize some of the coming damage by requiring Aerotek and Allegis to post a $5 billion bond for their role in helping carry out this fraud by interfering with Levi's SOX cases and civil case against AB.

At any time in the last 3 years, Aerotek CEO Tom Thorton or Allegis co-Chairman Stephen Bisciotti could have come clean about their illegal termination of Levi and its coverup, and reported it in SOX proceedings, Court proceedings, or to the SEC or Justice Department. This would have set in motion the uncovering of AB's massive fraud, and preempted the sale of AB and the resultant damage. Levi has kept Bisciotti personally up to date throughout 2007 and 2008.

The Court has before it an opportunity it did not have in the Mad-

11

off fraud, the WorldCom fraud or Enron.

off fraud, the WorldCom fraud or Enron. The Court can secure the assets of the complicit before the certain implosion. The Court must use the Securities & Exchange Act, the Sarbanes-Oxley Act and any other federal and state laws available to require Allegis and Aerotek to post a $5 billion bond pending the outcome of this Levi v Aerotek/Allegis action. Aerotek and Allegis have at the very least a 10% culpability in the $40-60 billion AB, now AB/InBev securities fraud.

In addition, Levi is sending this complaint to Aerotek founder Bisciotti and Allegis co-Chairman James Davis with the hopes they will waive service because of the urgent nature of the AB/InBev situation. If they do not inform the Court of waiving service to Aerotek and Allegis, Levi asks the Court to waive service and consider the sending by Levi as service on Aerotek and Allegis. In addition, Levi asks the Court, regardless of service issues, to order Aerotek and Allegis to answer by the end of January, hopefully sooner if possible. Aerotek and Allegis have had 3 years to prepare for this day, and on November 27, 2008, Levi made another personal plea to Allegis co- Chairman Bisciotti to come clean, and informed Bisciotti litigation was to follow. A copy of this letter was sent to the SEC, FBI and Justice.

I, Hunter R. Levi, swear the above is true to the best of my knowledge and belief, and that a true copy of the above was sent by regular mail to Aerotek founder and majority shareholder Stephen Bisciotti and Allegis co-Chairman James Davis on _JANUARY 8, 2009_____.

_Hunter R Levi_  1/8/09
Hunter R. Levi   PRO SE   Date
13001 W118 Terrace
Overland Park, KS   66210

_____
NOTARY PUBLIC           DATE

**ACKNOWLEDGMENT**
State of _KS_
County of _Johnson_
On this _8th_ day of _Jan_, 2009, _Hunter R. Levi_ personally appeared before me,
___ whom is personally know to me,
_✓_ whose identity I verified on the basis of _KS DL_,
___ whose identity I verified on the oath or affirmation of _____,
a credible witness,
to be the signer of the above and he/she acknowledged that he/she signed it. _Bresach Behue_
Notary Signature
My Commission Expires: _4-27-2011_

[Notary stamp: My Appt. Expires 4-27-2011]